**STATE of Tennessee, Appellee,**

v.

**Jimmy Dean WILSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Nov. 25, 1980.

Permission to Appeal Denied by Supreme Court Feb. 2, 1981.

Lee, P. C. & Hanzelik, Ralph E. Vineyard, Chattanooga, for appellant.

William M. Leech, Jr., Atty. Gen., Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, Stanley J. Lanzo, Asst. Dist. Atty., Chattanooga, for appellee.

## OPINION

TATUM, Judge.

The defendant, Jimmy Dean Wilson, was sentenced to serve 15 years in the State penitentiary upon his conviction for armed robbery from 4 to 10 years on conviction of kidnapping, and 50 years on conviction of rape. On this appeal, he insists that the evidence is not sufficient to support the guilty verdicts and that the trial court erred in admitting evidence of a pre-trial lineup identification. After reviewing the record, we conclude that the judgments of conviction must be affirmed.

Before disposing of the issue testing the sufficiency of the evidence, we shall summarize the State's evidence, which was accredited by the jury. The victim was the manager of a Stop & Go convenience market in Chattanooga. She testified that at approximately 9:05 A.M., the defendant entered the store and purchased a soft drink. He then proceeded to operate a quarter pinball machine in the store. During the next ten minutes, he obtained from the victim four quarters for a one-dollar bill on two occasions. At 9:15 A.M., the victim wrote a draft for a beer supplier and noted the time in a log.

The beer supplier left the victim alone in the store with the defendant. As soon as the beer supplier left, the defendant approached the victim from behind; she turned around and observed that the defendant was brandishing a knife. He ordered her to open the cash register and told her, "This is a robbery." After taking money from the cash register, the defendant took a blue toboggan from his back pocket and pulled it over the victim's head and face.

The defendant led the victim to an automobile and pushed her inside of it. It was

approximately 9:25 A.M. at this time. The victim had some visibility, though the toboggan was pulled over her eyes, particularly when she focused her eyes downward. She described the automobile as a Ford Mustang with bucket seats, automatic transmission and a console located between the seats. The interior of the automobile was light blue in color; the exterior was light blue or silver in color. It was later established that the defendant's aunt, who lived directly behind his residence, owned an automobile fitting this description.

The defendant drove the victim to a wooded area[1] and forced her to submit to sexual intercourse. Upon completion of the act, the defendant removed the toboggan and tied the victim's pants and hose around her head. The defendant left after threatening to kill the victim if she moved. When the victim heard the defendant's car drive away, she ran to a waterplant and summoned aid. It was 9:55 A.M. when she reached the plant.

When the police arrived, the victim gave them an accurate description of the assailant which fit the appearance of the defendant. The assailant was wearing a light blue or green shirt and blue jeans.

Later, the victim viewed approximately 250 photographs furnished to her by police officers and made a tentative identification of a photograph of the defendant, but she requested to see the defendant in person to be certain of her identification. The photograph was approximately 4 years old; and in the photograph, the defendant's hair was dirty and rumpled. The victim was shown two lineups. The first lineup was composed of 7 young white men of approximately the same age and build as the defendant. The victim identified none of the participants in the first lineup. In the second lineup, composed of 6 young white men of the approximate height and weight of the defendant, the victim made a positive identification of the defendant. She also positively identified the defendant at trial, basing this iden-

tification upon her observation of the defendant on April 3.

Louella Bussey testified that she lived in the neighborhood of the Stop & Go where the victim worked. At noon on the day before the crimes occurred, a person identified by her as the defendant appeared at Mrs. Bussey's apartment and asked to borrow some jumper cables. He told Mrs. Bussey that his automobile was stalled on Route 153. Mrs. Bussey directed the defendant to another apartment in the duplex, where he borrowed the jumper cables. Later that evening, Mrs. Bussey drove along Route 153 and did not observe any disabled vehicle.

On April 3, 1979, the defendant again appeared at Mrs. Bussey's apartment at 7:45 A.M. He told her that the purpose of this visit was to return the cables; however, he also told her that he did not have the cables with him and that his car was still stalled on Route 153. On both visits, the defendant was wearing bluejeans and a blue jacket.[2]

When the defendent was arrested, his hair was parted in the middle as when the crimes were committed. When the defendant learned that he was going to be in a lineup, he combed his hair straight back. Before the lineup, the police recombed the defendant's hair as it was previously. He had also combed his hair differently at trial.

The defendant interposed an alibi defense. He testified that his girlfriend came to his grandmother's house where he was staying, shortly after 6:00 A.M. on the mornings of the crimes. He had an 8:30 A.M. appointment at the Manpower Office for assistance in obtaining employment. She drove him to town, and they sat in the car at the Manpower Office and ate a breakfast which the girlfriend had prepared. They both entered the Manpower Office at approximately 8:15 to 8:20 A.M., but he was not interviewed until about 9:00 A.M. or 9:10 A.M.. According to his testi-

---

1. When the defendant testified, he admitted that he had spent time in the wooded area and was familiar with that area.

2. The victim saw a blue jacket in her assailant's car.

mony, he did not finish the interview until approximately 9:30 A.M. and could not have been at the Stop & Go at around 9:05 A.M.[3]

The defendant testified that he did not own a car and had lost his driver's license for driving while intoxicated. Due to his excessive drinking, neither his aunt nor anyone else would lend him an automobile. He admitted having driven automobiles since his driver's license was revoked.

The defendant offered the evidence of several employees at the Manpower Office. The testimony of these witnesses supported the defendant in that he had been at their office on the morning of the crime, but this evidence did not exclude the reasonable possibility that the defendant could have left in time to reach the Stop & Go at 9:05 A.M. or even before. The testimony of the defendant's girlfriend, his mother, and his aunt supported his version.

 The credibility of witnesses is within the province of the jury. *Byrge v. State*, 575 S.W.2d 292 (Tenn.Cr.App.1978); *Wilson v. State*, 574 S.W.2d 52 (Tenn.Cr. App.1978). The jury resolved the inconsistencies in the evidence in favor of the State, both as to the alibi question and as to the issue of whether the defendant had access to an automobile. We find substantial evidence upon which a rational trier of fact could be convinced of the defendant's guilt beyond a reasonable doubt. We must therefore, resolve the first issue in favor of the State. Rule 13(e), Tennessee Rules of Appellate Procedure; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The defendant contends that the pre-trial lineup in which the victim identified him was unconstitutionally suggestive because "appellant was the only suspect in the lineup with long, blond hair, while the others were described as being black headed." The police officers presented 13 young men to the victim. They first permitted her to view 7 persons, among whom the defendant was not included. In this group, or first

lineup, there was at least one blond-headed person according to the color photograph which is an exhibit. The defendant was identified from among the last six persons presented; and all of these, except for the defendant, appeared to be dark-headed according to the black and white photograph of this group. However, there is evidence that the photograph is not accurate in that it shows objects to be darker than they actually were.

No pre-trial motion was filed to suppress the lineup identification, and no objection was made to the lineup identification evidence when offered. The matter was only mentioned by defense counsel in argument of his motion for a directed verdict made after the State had rested. No motion was made to strike this evidence. Rule 12(b)(3), Tennessee Rules of Criminal Procedure, requires motions to suppress to be made and determined before trial unless good cause is shown for deferment. Rule 12(f) provides that a failure to comply with this rule waives any objection otherwise available. See *Feagins v. State*, 596 S.W.2d 108 (Tenn. Cr.App.1979).

 The matter was first mentioned to the trial judge after the State had rested its case and presumably its witnesses had been excused. It is mandatory that a litigant object to incompetent evidence when offered; and if he fails to do so, he has waived any objection that he might have. *McCracken v. State*, 548 S.W.2d 340 (Tenn. Cr.App.1976). In *Whitnel v. State*, 564 S.W.2d 373, 375–376 (Tenn.Cr.App.1978), this court, speaking through Judge Daughtrey, said:

"Under the contemporaneous objection rule, 'errors, to which no objections are made and exceptions taken in the court below, cannot be raised on appeal.' *Ezell v. State*, 220 Tenn. 11, 413 S.W.2d 678, 681 (1967). Both the state and federal courts have long recognized that the rule requiring contemporaneous objection to the introduction of illegal evidence clearly serves a legitimate state interest.' *Crawford v. State*, 4 Tenn.Cr.App. 142,

---

**3.** It takes 17 minutes to drive from the Manpower Office to the Stop & Go when observing the speed limit at 2:30 P.M., when the traffic is heavier than it is at 8:30 A.M.

150, 469 S.W.2d 524, 527 (1971); *accord, Henry v. Mississippi*, 379 U.S. 443, 448, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, 608–09 (1977). The rule has also been held constitutional. *Wainwright v. Sykes*, supra 433 U.S. at 86, 97 S.Ct. at 2506, 53 L.Ed.2d at 608. Applied to the record before us that rule prevents our review of the search and seizure question on its merits. We therefore overrule the defendant's assignment of error attacking the legality of the evidence introduced in this case."

■ We find the degree of suggestiveness was not sufficient to give rise to "a very substantial likelihood of irreparable misidentification," especially when considered in the light of the factors for consideration in evaluating the likelihood of misidentification laid down in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). The victim clearly observed the defendant several times when he was in the store before the toboggan was placed over her head; it is undisputed that she got a "good look" at him. While she was looking at him as she gave him change, her attention was undivided; certainly she was no casual observer after he drew the knife. She gave a very detailed and accurate description of the defendant immediately after the criminal episode. The witness was very conscientious in that she refused to make a positive identification of the defendant from the photograph. The victim made a positive and absolute identification of the defendant when she saw him in the lineup. The crime was committed on April 3, 1978; the identification was made on April 17, 1978. These facts remove any reasonable likelihood of misidentification. *See Forbes v. State*, 559 S.W.2d 318, 322 (Tenn.1977).

■ While we do not find that this issue is meritorious, we must overrule it on the ground that the defendant waived his objection to it.

The judgments of the trial court are affirmed.

DWYER and CORNELIUS, JJ., concur.