IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2004

## STATE OF TENNESSEE v. JEFFREY MARTIN REAVES, ALIAS, ROLAND LEE MALLIN

**Appeal from the Criminal Court for Knox County**
**No. 64171     Mary Beth Leibowitz, Judge**

**No. E2003-01899-CCA-R3-CD - Filed January 27, 2005**

A Knox County Criminal Court jury convicted the defendant, Jeffrey Martin Reaves, of voluntary manslaughter, a Class C felony, attempted reckless homicide, a Class E felony, and misdemeanor reckless endangerment, a Class A misdemeanor, and the trial court sentenced him as a Range II, multiple offender to an effective sentence of ten years in the Department of Correction. The defendant appeals, claiming that the evidence is insufficient to support his convictions, that the trial court erred in applying certain enhancement factors, and that it erred in ordering consecutive sentencing. Because attempted reckless homicide is not a crime in Tennessee, we vacate the defendant's conviction for that count under plain error review. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Vacated in Part, Affirmed in Part**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Jeffrey Martin Reaves, alias, Roland Lee Mallin.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin James Allen and Deborah J. Herron, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's killing Mark Campbell. A Knox County Grand Jury indicted the defendant on charges of first degree murder, attempted first degree murder and felony reckless endangerment. At trial, Katina Brady testified that she was Mark Campbell's niece. She said that she lives with her husband, John Brady, in Strawberry Plains on the same tract of property

on which the victim lived at the time of his death. She said the property is located at 330 Wilhite Lane. She said that on Thursday, August 7, 1997, she was at Mark and Sharon Campbell's trailer and that she was talking to her aunt and planning a family yard sale for the upcoming weekend when the defendant, whom she knew as Roland, came to the Campbell trailer, knocked loudly on the door, and demanded to see the victim. She said her aunt told the defendant that the victim was not home. She said the defendant was upset because the victim gave away his job helping the victim to tear down old barns and sell the wood. She explained that the victim asked her husband, who was unemployed at the time, to help him because the defendant had not come to work for a few days. She said the defendant was cursing and making threats. She said the defendant demanded to know whose truck was in the driveway. She said that when the defendant left, he said, "I will be back and I will take this up with him." She said that when the defendant left in his car, he "fishtailed" out of the driveway.

Mrs. Brady testified that she next saw the defendant on Saturday, August 9, 1997, when he arrived at the victim's house and parked next to the victim's brick-encased mailbox. She said the defendant had two children in the car. She said she was with her mother, Kathy Campbell, at her grandparents' house helping with the yard sale. She said her grandparents, Gene and Doris Campbell, lived directly across the street from the victim. She said that the defendant got out of his car and acted very aggressively. She said that the defendant and the victim went to her grandfather's barn to get a car part but that they began to argue when they returned. She said the defendant was very loud. She acknowledged that in response to the defendant's aggressive behavior, the victim picked up a "2 by 4." She said she called 9-1-1. She said that the victim told the defendant to leave his property but that the defendant retorted, "Do not tell me what to do." She said that the defendant then pulled a gun out of his coat pocket and began shooting, first at her grandfather and then at the victim. She said that although her grandfather was not hit, the victim fell after having been shot twice. She said that after the defendant shot the victim, her grandfather and her husband went after the defendant, chasing him around the car. She said the defendant was able to elude them momentarily and slip into the driver seat of his car. She said the defendant immediately drove off to the end of Wilhite Lane, which is a dead end. She said her grandfather and husband were still fighting with the defendant when he drove off.

Mrs. Brady testified that as soon as the defendant left, members of her family rushed to the victim's aid. She said that during this time, the defendant had turned his car around and was looking at her family members congregated around the victim. She said she followed the defendant's car down to the end of Wilhite Lane in order to give the 9-1-1 operator a description of the car and the license plate. She said that after a few minutes, the defendant attempted to leave. She said that he accelerated rapidly and that when he came within ten to fifteen feet of the victim, he began shooting into the crowd. She said that her grandfather threw the "2 by 4" at the defendant's car as he drove by but that the board did not go into the car. She said that she remained on the telephone with the 9-1-1 operator during the entire sequence of events.

On cross-examination, Mrs. Brady acknowledged that before her testimony at trial, she had not told anyone about the defendant being angry and pounding on her aunt's door. She

acknowledged that while the 9-1-1 tape recorded the initial volley of gunfire, the tape was devoid of the sounds of a second series of gunshots, which she claimed the defendant fired into the crowd while he was leaving the scene. She also acknowledged that when he left the scene, she was standing outside with the telephone talking with the 9-1-1 operator. She said the second series of gunshots was probably not on the tape because she was talking and screaming. She acknowledged that she did not initially tell the police investigators that the victim had picked up a "2 by 4." She said that she did not specifically remember at what point the victim picked up the piece of lumber.

On re-direct examination, she said that the 9-1-1 tape only recorded the sound of one gunshot, even though the victim was shot twice. She said that although the victim had the "2 by 4," he never attempted to hit the defendant with it.

Robert Eugene Campbell testified that he was the victim's father, that he lived on Wilhite Lane directly across the street from the victim, and that he was a witness to the events which occurred on both August 7 and August 9, 1997. He said that he was outside in his yard on August 7, 1997, when the defendant drove into his son's driveway and went to the door. He said the defendant was loud and angry while he was talking to his daughter-in-law. He said that because of the tone of the defendant's voice and his demeanor, he decided to go over to his son's house in order to find out what was happening but that he stopped because the defendant went back to his car and left at a high rate of speed.

Mr. Campbell testified that on August 9, 1997, he was outside cleaning up from a yard sale with other members of his family when the defendant arrived. He said that when he first saw the defendant, the defendant was walking back toward his car with the victim. Mr. Campbell said he could hear the victim tell the defendant to leave his property. He said that he arrived near the defendant's car at about this time and told the defendant, "Boy, you better just get on out of here before you bite off more than you can chew." Mr. Campbell said that upon hearing these words, the defendant replied, "Don't nobody tell me what to do." Mr. Campbell said the defendant then pulled his gun from his coat pocket and began firing. Mr. Campbell said the defendant missed him but hit the victim. Mr. Campbell said that as soon as the defendant began firing the gun, he went toward the defendant to stop him. He said that the defendant continued to fire the gun at him but that it was empty. He said the defendant was able to get into his car and drive toward the end of Wilhite Lane. He said that the defendant then drove back and that when he passed the group of people near the victim, he began shooting again. Mr. Campbell said that during the entire time he witnessed these events, the victim did not swing the board at the defendant nor did he act like he was going to swing the board at the defendant.

On cross-examination, Mr. Campbell acknowledged that the defendant did not fire his gun at the victim until after the defendant retreated around the car. He also acknowledged he never heard the shots that the defendant allegedly fired as he was leaving the scene.

Michael John Brady testified that he lived with his wife, Katina, at 330 Wilhite Lane. He said, however, that when the shooting occurred, he and his wife were living in Jefferson City. He

-3-

said that on Wednesday, August 6, 1997, he worked for the victim, tearing down a barn in the vicinity of Strawberry Plains. He said that he was working for the victim because the defendant, whom he knew as Roland, had not shown up for work. He said that on Saturday, August 9, 1997, he was at the family yard sale and that he was helping tear down the yard sale when the defendant arrived. Mr. Brady said that the defendant and the victim went to the victim's truck which was parked near the barn and that the victim gave the defendant a car part. He said that when the two men returned to the area near the defendant's car, their conversation became heated. Mr. Brady said the victim was telling the defendant to leave his property. He said the defendant began walking back toward his car while simultaneously stating to the victim, "Come on up here; I'll show you something; come on up here; I'll show you something." Mr. Brady said that upon hearing the threatening tone of the defendant, the victim picked up a "4 by 4" and put it on his shoulder. Mr. Brady said the defendant pulled a gun out of his jacket pocket and, after stating "Nobody tells me what to do," fired the gun twice in the direction of Gene Campbell who was approaching the scene. Mr. Brady said that as soon as the defendant fired the gun, the victim started toward the defendant but that he did not reach the defendant because the defendant was backing up and around the car. He said that the victim continued in pursuit of the defendant around the car but that the defendant fired two or three more shots striking the victim who collapsed a few feet away from the defendant. Mr. Brady said that Gene Campbell then grabbed the defendant and a struggle ensued. He said that during the struggle, he could hear the gun clicking, which he believed was an indication that the gun was out of ammunition. He said that during this time, he was also approaching the car to help stop the defendant but that despite his attempt to grab him through the open car door, the defendant was able to drive off. He said the defendant remained at the end of Wilhite Lane for a short time before driving back past the scene and firing his gun again at the crowd. Mr. Brady said that when he went to check on the victim, he noticed that the victim had been shot in the throat and was not breathing.

On cross-examination, Mr. Brady acknowledged inconsistencies between his in-court testimony and the statement he gave to police the day of the shooting. He acknowledged that on the day of the shooting, he told the police investigators that the defendant fired two shots at Gene Campbell and four shots at the victim. He acknowledged that four shots was inconsistent with his testimony that the defendant fired two or three shots at the victim. He said, however, that he was mistaken on the day of the shooting because of the stress resulting from watching the defendant shoot and kill the victim. He acknowledged that he did not know on the day of the shooting that the defendant's weapon only held a maximum of five rounds of ammunition. He also acknowledged telling the investigators on the day of the shooting that he was able to understand what was being said between the defendant and the victim because he could read lips but testifying on direct examination that he heard what was said as he was approaching because they were talking in raised voices.

The state also called Doris Campbell and Ronald Keith Collier to testify as eyewitnesses to the events which transpired on August 9, 1997. However, their testimony is cumulative to that of Mrs. Brady, Mr. Campbell, and Mr. Brady. The state also called crime scene investigators, police officers, weapons experts, and the county coroner. Because the defendant took the stand and

-4-

admitted shooting the victim but claimed he did so in self-defense, we need not address the testimony of these witnesses.

Jimmy Golden testified for the defendant. He said that he knew the defendant as Jeffrey Reaves and that the defendant was a mechanic. He said that on Saturday, August 9, 1997, he went by the defendant's house to pick up a car engine. He said the engine was missing a valve cover. He said that the defendant told him the car part was at the victim's house and that the defendant told him he would get the car part from the victim's house and bring it to him.

Debbie Fawver testified for the defendant. She said she was the victim's ex-wife and mother of his child. She said she began dating the victim when she was twelve years old and the victim was eighteen. She said she married the victim when she was eighteen and he was twenty-seven. She said that the victim had a temper and that she witnessed it during her fifteen-year relationship with him. She said his temper led him to violence. She said that she personally witnessed the victim fight her father, two uncles, great-uncle, and brother-in-law at her grandmother's house one Christmas Eve and that the victim "whipped them all." She said that the victim often was violent toward her and that the violence included kicking, choking, and punching. She said that on one occasion, the victim put a loaded .38 caliber gun to her head, cocked it, and asked her if God or her father would prevent her from "gettin' [her] brains blown all over the bathroom wall." She said that the victim was violent when he was intoxicated and when he was sober. She said that in the fifteen years she was with the victim, he was never afraid because he thought "[h]e was ten foot tall and bullet proof."

The defendant testified that he has a common-law wife and two children. He said that he had only about a tenth-grade education and that he worked mainly as an mechanic on cars. He said that although he worked with the victim on two occasions, he never worked as his employee. He said that when he worked with the victim, the victim came by his house and picked him up. He said he always carried his gun with him because the house he lived in had no locks on the doors. He said he did not go to the victim's trailer on Thursday, August 7, 1997. He said that on the day of the shooting, he needed to retrieve a "valve cover," which he had found when working with the victim and which the victim was keeping for him. He said he went to the victim's house with his common-law wife and two daughters, who accompanied him because they were also going to the grocery store. He said that when he arrived at the victim's house, he parked his car by the mailbox and went to the front door. He said that as soon as the victim saw him he said, "M***** f*****, why you–why you over here?" He said that he replied, "I just come over here to get the valve cover out of your truck." He said the victim then walked with him to the truck where he was able to retrieve the valve cover. He said that the victim was highly upset and that the victim picked up a "big board" and came at him. He said that when the victim began to assault him, he was terrified but still holding the valve cover. He said he immediately went to his car while saying, "Mark, why are you actin' like this?" He said the victim began cursing at him and ordered him to leave. He said that he was afraid the victim was going to strike him with the board and that he reached into his car and retrieved his gun. He said that he did not immediately shoot anyone even though the victim was still coming at him in an aggressive manner, forcing him to retreat around the car. He said that fearing for the safety of himself and his family, he eventually fired the gun three or four times. He said that after he fired

the gun, he tried to get back into his car and leave. He said that Gene Campbell was trying to stop him from leaving but that he was able to get away from him and leave. He said he drove straight to the end of Wilhite Lane, turned his car around, and left. He said he did not stop at the end of Wilhite Lane and did not fire his gun again even though Gene Campbell threw the board at his car as he was leaving.

On cross-examination, the defendant testified that his given name is Jeffrey Martin Reaves but that he was using an alias, Roland Lee Mallin, at the time of the shooting. He said that he never fired his gun at Gene Campbell. The defendant acknowledged that there were some inconsistencies between a statement he gave to police after his arrest and his testimony at trial. He acknowledged that he originally told the investigators that a dent in his car door was the result of the victim swinging the board at him and missing. However, at trial, the defendant testified that the victim only swung the board at him once, and that, thereafter, he retreated toward his car.

The jury convicted the defendant of voluntary manslaughter, attempted reckless homicide, and misdemeanor reckless endangerment. On appeal, the defendant challenges the sufficiency of the evidence and claims his sentence is excessive. The state contends the evidence is sufficient and that the defendant's sentence is proper.

## I. ATTEMPTED RECKLESS HOMICIDE

We begin by noting that the defendant does not contest the fact that he was convicted of a crime that does not exist in our jurisdiction. Failure to raise an issue on appeal constitutes waiver. See T.R.A.P. 13(b). However, because the defendant was convicted of and sentenced for a crime which does not exist in Tennessee, we review his conviction under Rule 52(b), Tenn. R. Crim. P., which provides,

> (b) Plain Error. - An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

See also T.R.A.P. 36(b).

Our supreme court

> has developed five factors to consider when deciding whether an error constitutes 'plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

In State v. Kimbrough, 924 S.W.2d 888, 892 (Tenn. 1996), our supreme court stated "that it is logically and legally impossible to attempt to perpetrate an unintentional killing." Relying upon Kimbrough, this court held that attempted reckless homicide does not constitute a crime because "an attempted reckless homicide would indeed require the actor to intend to commit an unintentional act; therefore, it is not a recognized crime in Tennessee." State v. Vernon Lamar Bryant, No. E2002-012340-CCA-R3-CD, Hamilton County, slip op. at 2-3 (Tenn. Crim. App. Oct. 21, 2003), app. denied (Tenn. Mar. 22, 2004); see also State v. Kenneth Anthony Henderson, No. M1999-00547-CCA-R3-CD, Davidson County (Tenn. Crim. App. Apr. 11, 2002) (observing that attempted reckless homicide is not a lesser included offense of attempted first degree murder because it does not exist as an offense in Tennessee). The defendant was convicted of a crime which does not exist and the conviction is void. As it is plain error, we hold that the defendant's conviction for attempted reckless homicide must be vacated.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his convictions for voluntary manslaughter and reckless endangerment. Concerning the voluntary manslaughter conviction, the defendant contends that the evidence is insufficient because the proof shows that he acted in self-defense. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Tennessee's self-defense statute, T.C.A. § 39-11-611(a), provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or

-7-

attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The state has the burden of negating any defense raised by supporting evidence. See T.C.A. § 39-11-201(a)(3).

We believe the evidence is sufficient to warrant the jury's rejection of the defendant's self-defense claim. The testimony produced at trial differed greatly. The witnesses for the state testified that the victim was simply ordering the defendant off his property when the defendant began shooting. Ms. Fawver testified that the victim was a violent man who thought "[h]e was ten foot tall and bullet proof." The defendant testified that he only began shooting after the victim chased him around his car because he feared for the safety of himself and his children. We conclude that given these circumstances, a rational juror could have accredited the state's witnesses and disregarded the defendant's claim of self-defense.

The defendant next contends that the evidence does not support a verdict of guilt for misdemeanor reckless endangerment because either the jury believed that the defendant fired his gun while leaving the scene, thereby supporting a conviction for felony reckless endangerment, or they believed he did not, thereby supporting a verdict of not guilty. In Tennessee, a person commits reckless endangerment by engaging "in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). "[R]eckless endangerment committed with a deadly weapon is a Class E felony." Id. § 39-13-103(b). Deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury . . . ." Id. § 39-11-106(5).

In a light most favorable to the state, the evidence shows that the defendant fired a weapon into the crowd gathered around the victim as he was leaving. It also shows that as he left, he drove by the scene at a high rate of speed. This evidence would have supported a jury verdict of felony reckless endangerment. While the jury convicted the defendant of the lesser included offense of misdemeanor reckless endangerment, we note that it was their prerogative to do so. See, e.g., State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002) ("We therefore cannot agree that the decision to convict on a lesser-included offense may be taken away from the jury whenever proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted."). The evidence was sufficient to support the jury's verdict of guilt for misdemeanor reckless endangerment.

### III. EXCESSIVE SENTENCE

The defendant contends that his sentence is excessive. He argues that the trial court erred in sentencing him as a Range II, multiple offender because the state failed to comply with the

mandatory ten-day notice requirement, that the trial court erred in imposing consecutive sentencing, and that the trial court misapplied certain enhancement factors under existing state law and the rule announced in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The state contends that it properly filed the requisite pre-trial notice concerning its intent to seek enhanced punishment and that the trial court properly imposed consecutive sentencing. The state on appeal, however, concedes that the trial court erred in applying certain enhancement factors under state law but that the defendant's sentence is justified in light of the remaining enhancement factors. The state also contends that the defendant has waived any Blakely issue by failing to present it in the trial court. Because we vacate the defendant's conviction for attempted reckless homicide, the defendant's appeal of the consecutive sentencing determination is moot. In all other respects, we affirm the sentencing judgments of the trial court.

At the sentencing hearing, the state introduced the presentence report into evidence, and the defendant called his prior attorney to testify as to his history of mental instability. After listening to counsels' arguments, the trial court found that the defendant was a Range II, multiple offender and that the following enhancement factors listed in T.C.A. § 40-35-114 applied: (2), that the defendant has prior convictions "in addition to those necessary to establish the appropriate range;" (9), that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;" (10), that the defendant used "a firearm . . . during the commission of the offense;" (11), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high;" and (17), that the defendant committed the crime "under circumstances under which the potential for bodily injury to a victim was great." The trial court then applied the following mitigating factors listed in T.C.A. § 40-35-113: (8), that "[t]he defendant was suffering from a mental . . . condition that significantly reduced the defendant's culpability for the offense," and (11), that the defendant "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." After considering the various factors, the trial court enhanced the defendant's sentence for voluntary manslaughter from six years, the minimum within the range, to eight years, the midpoint within the range.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

## A. Defendant's Status as a Range II, Multiple Offender

The defendant argues that the trial court improperly found him to be a Range II, multiple offender because the state failed to give him the required ten-day notice before trial of its intent to seek enhanced punishment. The state contends that it complied with the notice requirement. We hold that although the state failed to give proper notice, the defendant did not avail himself of the statutory remedies, and he failed to demonstrate that he suffered any prejudice as a result of the state's noncompliance with the notice requirement.

T.C.A. § 40-35-202(a) provides,

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea.

See also Tenn. R. Crim. P. 12.3 (stating that if notice is filed later than ten days, the trial judge "shall grant the defendant, upon motion, a reasonable continuance of the trial"). Rule 45(a), Tenn. R. Crim. P., provides that when calculating

> any period of time the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday, or a day when the clerk's office for filing is closed, in which event the period runs until the end

of the next day which is not a Saturday, a Sunday, or a legal holiday, or a day when the clerk's office for filing is closed.

The record reflects that the state's notice of intent to seek enhanced punishment was filed, with an appropriate certificate of service, on May 22, 2003. It also reflects that the trial of this matter began on Monday, June 2, 2003. The period of time from May 22, 2003, until the day before trial, June 1, 2003, was ten days. In this regard, we hold that the last day of the required ten-day notice in T.C.A. § 40-35-202(a) for computation purposes is the day before trial. See State v. Wilson, 611 S.W.2d 843 (Tenn. Crim. App. 1980) (holding that "prior to trial" in the context of Rule 12(b)(3), Tenn. R. Crim. P., requires a motion to be made and determined sometime earlier than the day of trial); cf. Tenn. R. Evid. 410(d)(1)(I) (stating a motion seeking to introduce prior sexual behavior "shall be filed no later than ten days before the date on which the trial is scheduled to begin"); State v. Rico L. Raybon, No. W2001-01303-CCA-R3-CD, Shelby County (Tenn. Crim. App. Sept. 9, 2002). In this case, however, because June 1, 2003, was a Sunday, the motion was not timely filed, and the trial court's finding that the state complied with the ten-day notice requirement was erroneous.

The defendant asserts that because the ten-day notice requirement was not met, the remedy must be that he be resentenced as a Range I, standard offender. The state counters that the defendant has shown no prejudice and therefore is not entitled to relief. Because this is a question of law, our review is de novo. State v. Carter, 121 S.W.3d 579, 584 (Tenn. 2003); State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997). We hold that because the defendant failed to follow the remedial measures provided for in T.C.A. § 40-35-202 and has shown no prejudice, he is not entitled to relief on this issue.

The Advisory Commission Comments to Rule 12.3, Tenn. R. Crim. P., the rule which mirrors T.C.A. § 40-35-202, state, "If the defendant does not request a continuance, the written notice shall be valid." The right to a continuance pursuant to this rule is absolute upon proper motion and the trial court must either strike the state's notice of enhancement or grant a continuance. See State v. Lowe, 811 S.W.2d 526 (Tenn. 1991); State v. Morgan, 929 S.W.2d 380 (Tenn. Crim. App. 1996). Moreover, "if notice is filed late or is filed timely but is otherwise defective, the defendant must show prejudice before the notice will be rendered ineffective." Carter, 121 S.W.3d at 585 (citing State v. Stephenson, 752 S.W.2d 80, 81 (Tenn. 1988) (holding that notice filed the day trial began was not ineffective because the defendant failed to show prejudice or request a continuance); State v. Debro, 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1989)). "On the other hand, failure to file any notice of sentencing status is grounds for re-sentencing." Carter, 121 S.W.3d at 585; see State v. Pender, 687 S.W.2d 714, 719-20 (Tenn. Crim. App. 1984).

While the defendant is correct that the state did not comply with the rigors of T.C.A. § 40-35-202(a) and Rule 12.3, Tenn. R. Crim. P., he failed to take the remedial measures provided for by the rule. We note from the record that the defendant objected to the state's failure to provide proper notice, stating that striking the state's notice to seek enhanced punishment was the only available remedy as a further continuance of the case was not practicable because of the defendant's mental

health.[1]  However, the record does not sufficiently resolve the issue of why a continuance was not possible.  The defendant on appeal also fails to address the issue of prejudice.  The defendant is not entitled to relief on this issue.

## B.  Enhancement Factors/<u>Blakely</u>

Finally, the defendant contends that the trial court erred in applying certain enhancement factors.  The state concedes that the trial court erred in applying enhancement factors (11) and (17) but that the sentence imposed by the trial court was justified

We note that the defendant has failed to include the presentence report in the appellate record.  It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal.  T.R.A.P. 24(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6 (Tenn. Crim. App. 1987).  Generally, this court is precluded from addressing an issue on appeal when the record fails to include relevant documents.  See T.R.A.P. 24; State v. Bennett, 798 S.W.2d 783 (Tenn. Crim. App. 1990); see also State v. Robinson, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001).  Because the defendant has failed to include the presentence report in the record, we cannot complete a de novo review of his sentence.  See T.C.A. § 40-35-210(g).  In any event, while the defendant challenged the accuracy of the presentence report, the record reflects that he did not contest the trial court's determination that he had two felony convictions in addition to those necessary to establish the appropriate range.  Therefore, under both state law and the rule announced in Blakely, the trial court's enhancement of the defendant's sentence from eight years to ten years was justified.

Based upon the foregoing and the record as a whole, we vacate the defendant's conviction for attempted reckless homicide.  We affirm the other judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE

---

[1]This case took over six years to come to trial because, in part, the defendant was adjudicated incompetent to stand trial.